# N. L. BREWER, Administrator, etc., *vs.* EMILY J. BOWERSOX.

*Tenancy by Entireties in Personal Property—Right of Surviving Wife to Certificate of Deposit Payable to Her and Her Husband—Presumptions—Estoppel to Claim Fund—Objections to Competency of Witness—Execution of Commission to Take Testimony of Non-Resident Witness.*

When a conveyance or gift is made to two persons who are husband and wife, without any qualifying words, they take the property as tenants by the entireties, and the right of survivorship, which is one of the chief incidents of that estate, cannot be destroyed except by the joint act of the two, and upon the death of either, the other succeeds to the entire property.

A tenancy by the entireties may be created in personal property.

A husband deposited money in a bank in another State in the names of himself and wife, subject to the order of either. His wife received from him the certificate for this sum, and she afterwards caused the same to be collected by a bank in this State, upon her own endorsement alone, and deposited the amount in the bank which issued therefor a certificate stating that the bank "has this day received of Jacob or Emily Bowersox $1,981.72, which sum, with the interest thereon at three per cent *per annum* will be paid to them or their order at sixty days' notice." The wife kept possession of this certificate until after her husband's death, when the fund was claimed by his administrator. There was no evidence that the wife had acted wrongfully in making the deposit in the above-mentioned form. *Held*, that the fund in question was owned by the husband and wife as tenants by the entireties, and that upon his death the entire property became vested in her.

A married woman, who, upon the death of her husband, was entitled as tenant by the entirety to a fund represented by a certificate of deposit, was told by the administrator of her husband's estate that the money belonged to his estate, and in consequence of that representation, and in ignorance of her rights, she delivered the certificate, endorsed, to the administrator. *Held*, that she was not thereby estopped from showing that the certificate was in fact her own property.

When an act may be either rightful or wrongful, according to the circumstances under which it was done, and there is no evidence of circumstances to show that it was wrongful, then the *præsumptio juris* is that it was rightful.

When a witness is competent to testify for some purposes, but not for all,

a general exception to his evidence will not be sustained, because too broad, but only the particular questions asked the witness to which objection was made will be held inadmissible.

The return of a foreign commission to take testimony certified that the commissionei "took the oath annexed," without stating before whom it was taken or that it was duly taken. *Held*, that the commission was not properly executed, since it does not expressly appear and cannot be justly inferred that the oath was taken before an officer authorized to administer it.

When a commission to take the testimony of non-resident witnesses directs the commissioner to make his return under seal, a return not under seal is invalid and not admissible in evidence.

Appeal from a decree of the Circuit Court for Frederick County (McSherry, C. J., and Motter, J.) The following opinion in that Court was delivered by McSherry, C. J.

There are several interesting questions presented by the record now before us. That they may be clearly understood a brief statement of the facts out of which they grow must first be made. The real contest is between the widow of Jacob Bowersox and the administrator *cum testamento annexo* of his estate; and the subject-matter of the controversy is an interest-bearing deposit in the Frederick Town Savings Institution, to which each lays claim.

Some years ago Jacob Bowersox married his second wife, who is the plaintiff in this case. At the time of his death, which occurred in this county during the year eighteen hundred and ninety-nine, he was considerably over eighty years of age, and for a while before his decease he had been in feeble and declining health. He left surviving him a widow, now about seventy-one years old, and some adult children by a former marriage. He had resided in the State of Ohio, but something over a year prior to his death he and his wife came to Frederick, where they remained until he died. Whilst he lived in the West he deposited in the City National Bank of Kalamazoo to his own credit a sum of twenty-eight hundred dollars. He received from the bank six certificates of deposit, five of these were for five hundred dollars each and one was for three hundred dollars. They were all payable to himself.

Two of them he parted with by indorsement. Thereafter he and his wife, the plaintiff, called at the bank in Kalamazoo and he gave specific directions to have the remaining deposit certificates changed in such a way as to enable either himself or his wife to draw the money. This change was thereupon made in accordance with his request so that either could draw the fund without the presence or the indorsement of the other. The outstanding and uncashed certificates were taken up by the bank and the fund was re-deposited to the credit of husband and wife subject to the order of either; and the new certificate, in that form, was delivered to him. Without pausing to consider whether her testimony, to the effect that her husband then and there gave or handed to her the new certificate, is admissible, we next find, through clearly competent testimony, that the new certificate was actually in the plaintiff's possession here in Frederick during the life-time of her husband. It is not disputed, but, on the contrary, has been distinctly proved by the defendants, that the plaintiff brought the Kalamazoo bank certificate, which was payable as just stated, to the order of either her husband or herself, to the Frederick Town Savings Institution with a request that it be collected. She alone indorsed it and she alone delivered it to the Savings Institution, which gave her a deposit slip in exchange. Later on, the money having been collected by the Savings Institution from the Kalamazoo bank she caused the fund to be entered as a special interest-bearing deposit after, as Mr. Markell states, she had taken time to consider what disposition she would make of it; and the Savings Institution issued and delivered to her a certificate which, as much of the controversy turns upon its language, will now be transcribed. It is in these words: "The Frederick Town Savings Institution of Frederick, has this day received of Jacob or Emily J. Bowersox nineteen hundred and eighty-one 72-100 dollars, which sum with the interest thereon at three per cent *per annum*, will be paid to *them* or *their* order, at sixty days' notice, after the expiration of six months from date. M. E. Doll, president; J. Marshall Miller, secretary." It is dated July the 15th, 1898.

There is not a particle of evidence to show that this paper ever left the possession of the plaintiff from the day she received it at the Savings Institution until she delivered it over to the Probate Judge in Tiffin, Ohio, after the death and burial of her husband.

Laying out of view for the moment the fact that the plaintiff did indorse the certificate now in controversy (because the fact and its legal effect will be discussed and determined later on) what were her rights, if any, under the Savings Institution's certificate of July the 15th, 1898? Prior to its issue had she any right to control or dispose of the fund to their joint credit in the Kalamazoo bank; and did she acquire any right to that fund after its collection by the Savings Institution, if she had none before; or, if she did have a right to it before, did she retain that right under the Savings Institution's certificate? These are the questions which lie at the threshold of the case.

Now, it will be observed that the *form* and *phraseology* of the certificate issued by the Savings Institution differs widely from any of the deposit entries or certificates that have ever been passed on by the Court of Appeals in the numerous cases decided by that tribunal on contentions over savings bank and other deposits. In the recent cases of *Whalen* v. *Milholland, Extr.*, 89 Md. 199, and *Baker* v. *Hedrick*, 85 Md. 645, many of the antecedent decisions were examined, and it will be found upon a reference to them that the principle which underlies them all has no application to the pending controversy. It may be stated as the result of all those cases that where money belonging to one person and known to belong to him, is deposited by him in his own name and in the name of another, but subject to the order of either, and the depositor retains possession, control and dominion over the pass-book or certificate without the production of which the fund can not be drawn, he does not part with the ownership of the fund, and the other person becomes merely an agent of the real owner acquiring no interest in the fund at all and ceasing upon the death of the owner to have any authority whatever as agent. And the

reason for this is apparent.   The owner of the money can by his own act voluntarily part with his ownership of it only by gift, payment or bequest.   Such a deposit as has just been named is obviously neither a bequest nor a payment, for it possesses none of the characteristics of either ; and it cannot be a gift to the other person mentioned in the bank-book or the certificate, because if the depositor retains the book or the certificate he retains complete dominion over the fund.   There can be no perfected gift where the supposed donor reserves a *locus pœnitentiæ*, and a *locus pœnitentiæ* is always reserved when the alleged donor may at any moment withdraw the fund from bank.   In none of the cases heretofore decided did the *form* of the deposit change the original ownership of the fund ;  but the *form* of *this* deposit is, as already observed, essentially different from that dealt with in the other cases.   A delivery of the bank-book or of the certificate of deposit with an intent to pass the ownership of the fund will perfect the gift and clothe the donee with an indefeasible right to the money on deposit.   *Whalen v. Milholland, supra.*

We have on the face of the certificate here involved a condition materially and radically different from that presented in any of the prior Maryland cases.   The paper in question is not a certificate evidencing a deposit in the joint names of two persons payable to the order of either, nor is it in the name of one payable to himself *or* another as in *Wrightson's case,* 63 Md. 81;  but it is a certificate wherein the depositors are *disjunctively* named, but the money is expressly made payable *only* to the *two* or to the order of the *two*.   And these two persons are in fact *husband* and *wife*.   This certificate is a *chose in action*, and it is a *chose in action* payable to husband and wife.   Clearly, neither of them could have drawn the money during the life of both without the consent of the other ;  because an indorsement by one would have been insufficient to transfer the certificate, and a surrender of it by one would have been ineffectual to constitute an extinguishment.   The specific terms of the contract of deposit embodied in the certificate made the fund the joint property of husband and wife,

because those very terms put it out of the power of the. husband to repossess himself of the fund during the life of the wife except with her consent and co-operation.   What, then, is the legal consequence of such a contract?   There was no relation by agency established by it.   That is obvious.   There was no *locus pœnitentiæ* reserved by it, because a separate dominion by either was completely superseded by a joint control.   There was no act which either the husband or the wife could do that would rescind the right of the other.   In a word, a tenancy by the entireties was created, and, of course, regard being had to the face of the paper alone, the legal consequences dependent on and flowing from that status must necessarily ensue.   Now, a tenancy by the entireties may be created in personalty.   *Ward* v. *Ward*, 14 Ch. Div. 506;  *In re Bryan*, 14 Ch. Div. 516; *Gordon* v. *Whieldon*, 11 Beav. 170; *Freem. Coton.*, secs. 66, 68; *Gillan* v. *Dixon*, 65 Pa. St. 395; *In re Bramberry's estate*, 156 Pa. 628; s. c., 27 Atl. Rep. 407.   The creation of a tenancy by the entireties does not depend on the *words* employed in making a conveyance or a gift to husband and wife.   The common law rule is that the words which in a conveyance to unmarried persons constitute a joint tenancy, will create, if the grantees are husband and wife, a tenancy by entireties ; and by the common law an estate granted to a number of persons without any restrictions or qualifications or explanations will be construed a joint-tenancy.   This latter doctrine of the common law was modified, indeed inverted, by the Maryland *Act of 1822, ch. 162 (sec. 13, Art. 50 of the Code)*, but that legislation has no relation to a tenancy by the entireties.   *Craft* v. *Wilcox*, 4 Gill, 504; *Marburg* v. *Cole*, 49 Md. 412; *Fladung* v. *Rose*, 58 Md. 20.   It is not because a conveyance or gift is made to husband and wife as joint-tenants that the estate by entireties arises, but it is because a conveyance or gift is made to two persons who *are* husband and wife ; and since in the contemplation of the common law they are but one person, they take and can only take, not by moieties, but the entirety.   The marital relation with its common law unity of two persons in one, gives rise to this peculiar

estate when a conveyance or gift is made to them without restrictive or qualifying words ; and they hold as tenants by the entirety, not because they are declared to so hold, but because they *are* husband and wife.    This estate with its incidents continues in Maryland as it existed at the common law. *McCubbin* v. *Stanford*, 85 Md. 390.    It differs materially from all other tenancies.    The right of survivorship, which is one of its chief incidents, can not be destroyed except by the joint-act of the two ; and upon the death of either the other succeeds to the entire property or fund.    2 *Bl. Com.*, 182; *Coke, Litt.*, 187A; *Green* v. *King*, 2 W. Bl. 1211; *Hanan* v. *Towers*, 3 Har. & J. 147.

Upon the face, then, of the certificate a tenancy by the entireties was created with all its legal incidents.    As a consequence upon the death of her husband the plaintiff became as the survivor of the two entitled to the fund, unless there is something in the record to show that the relation of tenancy by the entireties, though apparently existing, did not in reality exist ; or, unless it is made clear that having existed, the plaintiff validly surrendered the right which she acquired under that tendency.

*Wrightson's case*, 63 Md. 81, is clearly distinguishable from the case at bar.    In *Wrightson's case* the certificate did not create a tenancy by the entireties and there was no such claim set up.    It was the simple, ordinary case where the deposit stood in the name of the husband, though payable to the husband *or* wife.    That form of deposit brought the case within the scope of a different class of decisions.

It is indisputably clear from the testimony of the president of the Kalamazoo bank that the fund, whoever owned it before its deposit there, was finally deposited in that bank upon terms which permitted the plaintiff to draw it herself or on her own order.    The possession of the certificate by her, coupled with the form of the credit entry in the Kalamazoo bank, gave her full and complete dominion over the fund there deposited. Laying out of view her own testimony, she undoubtedly had the certificate issued by the bank in her possession here in

Frederick ; and she, and she alone, indorsed it and delivered it to the Savings Institution for collection.    These acts, it may be said, are equally consistent with the existence of an agency or an ownership, and if they stood alone, without more, would probably be insufficient to establish ownership to the exclusion of agency.    But the subsequent deposit in the Savings Institution to the joint-account of husband and wife, and it was a *joint*-account because so made by the certificate, was an act which must be regarded as having been done in virtue of the plaintiff's asserted and apparent ownership, *unless* it be assumed that the certificate was worded, as we now find it, either by deliberate wrongfulness or by inadvertent error.    If wrongfully phrased the wrong was that of the plaintiff, for it is not pretended that the officers of the Savings Institution are responsible for *wrongly* wording the certificate or for inserting in it terms which were at variance with the wish of its customer. Mrs. Bowersox claims the fund as hers, and the form of the certificate is consistent with that claim.    There is not a suggestion in the record that the certificate was worded as it is, by reason of an inadvertent error on the part of any one.    Excluding the inadmissible hypothesis of inadvertent error and excluding it because there is no evidence of any kind to sustain it, there are but these alternatives left, viz.: either that the entry was rightful or else that it was deliberately wrongful.    If rightful then a tenancy by the entireties was created, and, of course, rightfully created, and the fund now belongs to the plaintiff ; if deliberately wrongful, then a fraud was perpetrated on Jacob Bowersox, because *his* money was diverted from him and from his estate without his consent.    Which of these two extremes must be adopted?    Every presumption obtains in favor of innocence and good faith.    Where an act may be innocent or culpable, as antecedent circumstances make it the one or the other, and those antecedent circumstances are not disclosed ; the plainest dictates of justice require that the act shall be treated as an innocent act.    And so when the alternative is as to whether the act is rightful or wrongful, the act being one that may be either according to its environments,

and there is nothing to show that it is wrongful, the natural and the general presumption, founded on observation and experience, is that it was rightful. *Præsumptio Judicatur potentiorquæ est benignior, Wills Cir. Ev.* 157; *Jones* v. *Jones*, 45 Md. 158. Rightfully in possession of the Kalamazoo certificate which was made out in a way that enabled her to lawfully draw the money represented by it ; rightfully drawing that money, the plaintiff must, in accordance with the above principle, be held to have rightfully deposited the fund in the way it was deposited in the Savings Institution. This is presumptive evidence it is true, but it is *some* evidence of her right to the money ; though there is other and affirmative testimony which will now be considered.

Mrs. Bowersox, the plaintiff, was called as a witness in her own behalf. Her competency was objected to *generally*. This general objection to her competency—that is to her competency for any purpose—was renewed in writing and in addition sundry of the interrogatories propounded to her were excepted to and the exceptions were duly filed in this Court. The ground upon which the general objection is placed is this, that the other party to the transaction is dead. But that fact does not make her generally, that is *wholly* incompetent. The statute expressly permits her to testify as to conversations with the executor or administrator and much of the testimony given by her both in chief and on cross-examination had relation to such conversations. Obviously, therefore, the objection as made was too broad. If sustained it would exclude her altogether, though she is competent as a witness for some purposes. It is well settled that when evidence is offered generally and it is admissible for some purposes, though not for all, purposes, it will be error to reject it. *Byers* v. *Horner*, 47 Md. 23. And it is equally settled that where the proffered evidence is admissible for a special purpose a general objection to it will be overruled. *Nutwell* v. *Tongue*, 22 Md. 419. It has likewise been held that where a person who is a party to a suit in his capacity as administrator as well as in his individual right and testifies on his own offer, only so much of his testi-

mony is to be excluded as was excepted to.  *Dilley* v. *Love*,
61 Md. 603.  Since the decision of the last-named case in
March, 1884, the Evidence Act was amended.  The amend-
ment adopted in 1888 allows a party to a cause to testify in
certain instances, even though the opposite party be an exec-
utor or administrator.  The result is that the broad objection
of incompetency can not be sustained because *too* broad, but
the specific questions objected to are held to be inadmissible.
Had the objection to her competency been less general it
would have excluded her, except as respects those particulars
wherein under the statute she would have been competent.
*Baker* v. *Hedrick*, 85 Md. 645; *Shufelt* v. *Shufelt*, 86 Md. 519.
Consequently there is much of her testimony which is unob-
jected to and we may treat it as before us.  Thus in the 30th
intorrogatory she was asked, "How long did it (The Freder-
ick Town Savings Institution's certificate) remain in your pos-
session?"  And she answered, "Up to the death of Jacob,
Bowersox, and until I gave it over to the administrator."
31st.  "Was it so retained in your possession with your hus-
band's full knowledge and consent?"  And she replied, "Yes
sir, certainly."  In reply to the 27th cross-interrogatory she
said that she did not keep this certificate in the same package
with her husband's notes and mortgages.  There is an alter-
native view of this branch of the case which will be consid-
ered later on.

The case thus made by the plaintiff entitles her to relief.
Is there anything set up by the defendants which weakens or
overthrows it?  It is insisted that the plaintiff disclaimed any
right to the fund, and in furtherance of that disclaimer that
she assigned the Savings Institution certificate to the adminis-
trator *cum testamento annexo*.  It goes without saying that the
burden of proof to establish these matters of defence thus
relied on to avoid the legal effect of the certificate rests on
the defendants.  They have undertaken to discharge that bur-
den.  The evidence which they have adduced was taken under
a commission issued out of this Court to Willis Bacon and
under a commission issued to Frederick Wood.  The plain-

tiff has excepted to the evidence taken under these commissions and has founded her exceptions on the ground that the commissions were improperly executed and returned. It is asserted that it does not appear that either of these commissioners was duly sworn; and it is affirmatively obvious that neither commission was returned under the *seal* of the commissioner.

As to the first exception, that it does not appear that either commissioner duly qualified before executing the commission. In the earliest case on this subject, *State use of Williamson* v. *Levy*, 3 H. & McH. 591, decided in 1799, the deposition was admitted because the commissioners in their return certified and declared that they had been *duly* sworn. In *Wilson* v. *Mitchell*, 3 H. & J. 91, the oath appended to the commission was signed by the commissioners and then these words were added: "Sworn before us the 28th of May, 1806. Jos. Ingram, P. L. Brien;" and in the return it was stated "That after we had severally taken the oath directed in said commission, &c." Under these conditions the depositions were allowed to be read. In *Walkup* v. *Pratt*, 5 H. & J. 51, it appeared by the return of the commissioners that the oath annexed to the commission had been administered to one of the commissioners by a justice of the peace of Kent County, Delaware, and the commissioner's certificate stated that he had taken the oath annexed to the commission, "A certificate whereof is hereunto annexed." And it was held sufficient. In *Snavely* v. *McPherson*, 5 H. & J. 152, the oath purported to have been taken before Thos. Cochran, and it was presumed that he had the authority to administer it. In each of these cases, except the first, there was evidence on the face of the commission that the oath had been administered by some one, and this fact in conjunction with the commissioner's certificate furnished sufficient ground on which to base a presumption that the person administering the oath had authority to administer it. In the first case the return that the commissioner had been *duly* sworn, by its terms imported that the oath had been administered by some officer empowered to administer it,

because to be *duly* sworn is to be sworn by some one compe-
tent to administer an oath.    But in the case at bar neither the
commission to Bacon nor to Wood shows any signature ap-
pended to the oath annexed to the commission ; and the re-
turn certifies merely that " I took the oath annexed to said
commission."    But *before whom* was the oath taken ? It is not
stated that it was *duly* taken, but simply that .it was taken.
For aught, therefore, that appears, it may have been taken be-
fore some one *not* authorized to administer it, or before him-
self.    If this certificate were treated as sufficient evidence of
the commissioner having been sworn, such a ruling would go
much farther than any of the previous cases have ventured,
and would open the door for many irregularities to enter.    Mr.
Poe in his work on Practice, sec. 218, says : " In their return
it should affirmatively appear that they did thus qualify (that
is by taking the oath), and it is moreover desirable that the
particular mode of such qualification should be shown by the
certificate of the official by whom the oath was administered
to them, which certificate should be annexed to their return.
Their own averment, however, that they had taken the *oath
before an officer competent to administer it*, will be held to be
·sufficient, but to avoid all question the certificate of such offi-
·cer should be appended."    See, too, *Evans Prac.*, p. 283.
Whilst the tendency nowadays is to relax the stringency of
technical rules, both of pleading and practice (much, as the
writer believes, to the promotion of confusion rather than to
the attainment of certainty in judicial proceedings), still there
are some safeguards which an adherence to those rules affords,
that cannot be with impunity thrust aside. or whittled away
without introducing far greater evils than a reasonably strict
enforcement or observance of them would be likely to occa-
sion.    The regularity of the execution of foreign commissions
should be tenaciously insisted on ; and the evidence to show
that the commissioner charged with the duty of taking the
depositions was properly qualified before assuming his task
ought not to be supplied by mere conjecture.    There should
at least, be something to base an inference on.    To sustain

these returns an inference must be based on an inference. You may infer that a person administering an oath was authorized to administer it, if you have the *fact* established that the oath was *duly* administered; but if you are informed merely that " I took the oath annexed to the commission," you can not infer that it was *duly*, that is, lawfully, taken, unless you go back one step farther and also infer that it was administered by an officer empowered to administer it. Such a process of reaching a conclusion is too uncertain to be followed.

But there is another objection to which both of these commissions are open; and it is this, that *neither one is returned under seal.* This objection goes to the authentication of the returns. The commission itself, in explicit terms, directs the commissioner to make his return under seal. It was held in *State use of Williamson* v. *Levy*, 3 H. & McH. 591, that if the commissioners seal appeared on the outside envelope that would be sufficient; but even that is absent here. This requirement that the return should be under seal, must be complied with, as " In cases of this nature, great strictness and accuracy are required." *Tide Water Canal Co.* v. *Archer*, 9 G. & J. 502. The *form* of return given in *Barrolls Ch. Pr.*, p. 566, shows a seal to the commissioners signature. If the testimony adduced under these commissions were admissible it would show that the plaintiff had repeatedly declared that she had no right to the fund on deposit and now in controversy; and if unexplained would interpose a barrier which would preclude the relief which she seeks being granted; for it is an obvious principle that a recovery cannot be had by any one who unequivocally repudiates a right to recover. *Plant Mut. Ins. Co.* v. *Engle*, 52 Md. 479; *Leftwich* v. *Royal Ins. Co.*, 91 Md. 596. The effect of these admissions would, however, be materially weakened, if not neutralized by the testimony of Dr. McCurdy, who shows that the plaintiff was not, at the time she is alleged to have made these admissions, in a mental or physical condition to appreciate the force of them.

We have said that there is an alternative view of one branch of the case, and that view will now be adverted to. We have

treated the case thus far upon the theory that a part of the testimony of the plaintiff was admissible. But let it now be assumed that none of it was competent—that she was absolutely disqualified to testify at all—and let it further be assumed, as decided, that both the commissions to Bacon and Wood are out of the case; there will then be not a particle of evidence in the record to show that the money now in controversy ever, at any time, belonged exclusively to Jacob Bowersox. It is true the fact would remain, as stated by the president of the Kalamazoo bank, that the original deposit had been in the name of the plaintiff's husband; but there would be no evidence whatever as to the actual ownership of the fund. In that condition every act done by the plaintiff would be consistent with *her* ownership of the money and there could be nothing in the path of her right to relief but the fact that she indorsed the Savings Institution certificate and delivered it to the administrator *c. t. a.*

And this brings us to the consideration of that indorsement. If her testimony on the subject of this indorsement be treated as admissible, her act of indorsing the certificate is satisfactorily explained and could not prejudice her right to relief. If her testimony be excluded altogether and the evidence taken under the commissions rejected, there will remain nothing but the averments of the pleadings. Now, the bill alleges that the plaintiff delivered the indorsed certificate to Mr. Brewer, the administrator *c. t. a.*, because he represented to her that it belonged to her husband's estate; though it is nowhere asserted that she indorsed it for the purpose of transferring it to *him;* and the answer of Mr. Brewer admits that he made such a representation. But the answer goes on to allege that the plaintiff assented to the truth of this representation. This latter allegation is new matter which the replication put in issue, and there is no evidence to sustain it, as the evidence taken under the commissions has been excluded. So the averment of the bill and the admission of the answer establish the fact that the delivery of the indorsed certificate was made upon the faith of an assurance or representation that is not shown

to be true, but is rebutted by the presumption arising from her possession of the certificate and growing out of the terms in which that certificate is couched. There is not a suggestion anywhere that the plaintiff made the indorsement because the certificate actually belonged to her husband, or that she made it with a view to transfer to the administrator any interest she had or professed to have in the money covered by it.

It is noticeable that in not one of the Maryland cases from *Murray* v. *Cannon*, 41 Md. 466, to *Whalen* v. *Milholland*, 89 Md. 199, was the deposit under consideration made or the certificate worded so as to require the joint-order or joint-indorsement of husband and wife before the money could be drawn; whilst in the pending case a joint-indorsement was indispensable so long as both were alive. In this important particular the case at bar most materially differs from all that have preceded it.

It follows from the views herein expressed that by the right of survivorship, if in no other way, the money on deposit in the Savings Institution belongs to and is the property of Emily J. Bowersox; that she is entitled to the certificate which represents that money, because the record fails to show that a right superior to the one which the certificate itself and the possession of it denote, exists in any one else. A decree conforming to this conclusion and directing the certificate which is now in Court to be turned over to the plaintiff will be signed when presented.

The cause was argued before FOWLER, BRISCOE, PEARCE, SCHMUCKER and JONES, JJ.

*William P. Maulsby* and *Jacob Rohrback* for the appellant.

*Frank L. Stoner* for the appellee.

PER CURIAM:—We are of opinion that the decree appealed from in this case should be affirmed for the reasons given and upon the authorities cited in the opinion of the Court below. We adopt its opinion sent up with the record, and direct

that it be reported in full.    In addition to the authorities cited, we refer to the case of *Estate of William A. Parry*, 188 Pa. St. 33; 49 L. R. A. 444.

*Decree affirmed with costs above and below.*

(Decided February 8th, 1901.)

PEARCE, J., dissented and delivered the following opinion in which JONES, J., concurred:

I fully agree with so much of the opinion of the majority of the Court in this case as holds that "Upon the face of this certificate a tenancy by the entireties was created, with all its legal incidents, and that as a consequence, upon the death of the husband, the plaintiff became as the survivor of the two, entitled to the fund, *unless there is something in the record to show that the relation of tenancy by the entireties, though apparently existing, did not in reality exist.*"

I concur, also, in the approval of the rulings of the Circuit Court upon the exceptions to the testimony, but in spite of the very able opinion of the Circuit Court, adopted by the majority of this Court as its opinion, I am not able to concur in the affirmance of the decree, for the reasons which it seems proper for me to state as briefly as possible.    The history of the transactions leading up to this controversy is this.

In April, 1895, Jacob Bowersox, a citizen of Ohio, sold certain real estate in Ohio for $2,000 cash, he being then eighty-five years of age, and went with his wife, then sixty-seven years of age, to visit a daughter of his first marriage then residing in Michigan.    In March, 1896, he deposited in the City National Bank of Kalamazoo $2,800, and received therefor five certificates of $500 each, and one for $300, all made in his name. Two of these $500 certificates were paid upon his indorsement, June 3rd and 4th, 1896, and the amounts were received by his daughter, Clara Abbott, living in Michigan, and constituted, as appears by the second codicil to his will made November 21st, 1866, part of an advancement of $2,925 made by him to her.    On June 28th, 1897, the other four certificates aggregating $1,800, were surrendered by Mr. Bowersox, and a new

certificate for $1,924 (which included interest) was issued, payable to Jacob *or* Emily J. Bowersox, and was delivered *to him* by the president of the bank. This form was used at Mr. Bowersox' request, in order, as he stated to the president, that either one could get the money on it, without the presence or endorsement of the other. On the only two occasions when Mr. and Mrs. Bowersox were at the bank, when the original, and also when the substituted deposit was made, the president says, "*the business was done with Jacob Bowersox.*" The last certificate came back to the Kalamazoo bank July 5th, 1898, endorsed by Mrs. Bowersox and by the Frederick Town Savings Institution through which it was thus paid. On June 23rd, 1898, Mr. Markell, assistant secretary of the Frederick Town Savings Institution, states that Mrs. Boxersox came to the bank and gave him for collection a certificate of deposit on the City National Bank of Kalamazoo, dated June 28th, 1897, for $1,924, for which he gave her a credit slip for $1,981.72 (including a year's interest) in the name of Jacob *or* Emily J. Bowersox. When asked if she wished it to be at interest she replied she would wait till she had made up her mind what she would do with it, and about the middle of July, 1898, she asked to have it transferred to the interest account, and the certificate in question was issued and delivered to her. It does not appear either from Mr. Markell's testimony or her own that she gave any direction, or made any request, as to the form or phraseology of this certificate, or that she asked any information in regard to it, either before or after its issuance and delivery to her, nor is there to be found anywhere in the record, any explanation or suggestion why the peculiar form adopted was so adopted. It remained, however, in her possession, under circumstances which will be hereafter stated, until Mr. Bowersox' death, January 20th, 1899. His remains were taken at once to Ohio for burial, and having learned through Dr. McCurdy, that her husband's estate would have to be settled at his domicil in Ohio, she took to Ohio her husband's papers of value, *and this certificate*, which, with her husband's other valuables, she delivered to the Probate Judge

temporarily, and subsequently endorsed the certificate to N. L. Brewer upon his appointment and qualification as administrator, and upon refusal of the bank to recognize the right of either claimant, these proceedings followed. It should be observed here that Mr. Bowersox, by his will, made in May, 1890, excluded one of his four children from participating in his personal estate, and gave to his wife, *absolutely*, one-fourth part of his personal estate and one-fifth part of his real estate; that by the first codicil, made June 13th, 1896, the wife's absolute share of the personalty was increased to one-third, and of the realty to one-fourth ; and that by the last codicil made November 21st, 1896, she was made sole executrix, one of his sons-in-law having been before that named as co-executor. Also that upon the death of her sister, Mrs. Bentz, in January, 1897, Mrs. Bowersox received both real and personal estate under her will.

Much of the difficulty which is encountered in cases of this character disappears, if it can be ascertained clearly at the outset to whom the money originally belonged before it was so deposited, and it is therefore to be regretted that we cannot resort to the testimony of Jos. R. Drown, Mary J. Drown, Nelson L. Brewer, Clara Abbott and Probate Judge Wagner, much of which is directed to this question, and of which the Circuit Court says, " if the testimony adduced under these (excluded) commissions were admissible, it would show that the plaintiff had repeatedly declared that she had no right to the fund on deposit, and now in controversy; *and if unexplained, would interpose a barrier which would preclude the relief she seeks being granted.*" Under the ruling upon the testimony, there is much of Mrs. Bowersox' testimony before us, as well as all the testimony of Mr. Dayton, president of the Kalamazoo bank, Mr. Markell of the Frederick Town Savings Institution, Dr. McCurdy, and Mr. and Mrs. Rhoads : and from a careful consideration of these unaided sources of information, we do not doubt that the money so deposited belonged to Jacob Bowersox. Indeed this is conclusively established by Mrs. Bowersox' testimony. On cross-examination she was

asked how the $1,981.72 came into her husbands possession, and she replied, "in different ways." When asked if it did not come from the sale of his real estate, she said, "part of it did, I can't say what part." When asked what he received from this sale, she replied $2,000, and said the amount in the Frederick Town Savings Institution was a part of this sum. Nowhere did she *claim* any part of it was hers, and the inference is strong that no part of it was hers. Finally, when asked, "Had you any separate estate of your own before you came to Frederick (July 1st, 1897), and received the property your sister, Mrs. Bentz, left to you?" she answered, "*No I had not.* Nothing but this certificate. I had a little personal property. I mean a little wearing apparel and household effects." Nothing is here left to inference, and his ownership of the money is put beyond the pale of inquiry.

Resorting again to the language of the opinion of the Circuit Court. "It may be stated as the result of all those (the Maryland) cases, that where money belonging to one person and known to belong to him, is deposited by him in his own name and in the name of another, but subject to the order of either, and the depositor retains possession, control and dominion over the pass-book or certificate, without the production of which the fund cannot be drawn, he does not part with the ownership of the fund, and the other person becomes merely an agent of the real owner, acquiring no interest in the fund at all, and ceasing upon the death of the owner to have any authority whatever as agent. And the reason for this is apparent. The owner of the money can by his own act voluntarily part with his ownership of it, *only by gift, payment or bequest.* Such a deposit, as has just been named, is obviously neither a bequest nor a payment, for it possesses none of the characteristics of either; and it cannot be a gift to the other person mentioned.in the bank-book or the certificate, because, if the depositor retains the book or the certificate, he retains complete dominion over the fund. There can be no perfected gift where the supposed donor reserves a *locus pœnitentiæ*, and a *locus pœnitentiæ* is always reserved when the alleged donor may

at any moment withdraw the fund from the bank.  *   *   *
A delivery of the bank-book, or of the certificate of deposit
*with an intent to pass the ownership of the fund* will perfect the
gift and clothe the donee with an indefeasible right to the
money on deposit."

And in *Whalen* v. *Milholland*, 89 Md. 206, this Court, speak-
ing through the present Chief Justice, said, "*Posssession* is dis-
tinguishable from *delivery.* There may be possession where
there has been no delivery ;  *   *   *   *   A distinct une-
quivocal delivery of the book to the other person named as
co-owner, *with the intention to part with the ownership and to
make an irrevocable gift of the fund, and an acceptance of it by
the donee*, would pass the whole interest therein to the donee.
Every element of a perfected gift would then be present.''

In the present case the original deposit in the Kalamazoo
bank was made by the husband of his own money, in his own
name alone, and he drew out and disposed of $1,000 of the
amount, and each succeeding transaction, antedating the certifi-
cate in question, bears the ear-mark of the wife's agency re-
ferred to in all the cases.   When the second certificate was
issued by the Kalamazoo bank it was payable to the order *of
either*, and the president says he delivered it *to the husband.*
When the same certificate was afterwards taken by the wife to
the Frederick Town bank for collection, Mr. Markell states,
and she confirms him, that the deposit slip given her was is-
sued to Jacob or Emily J. Bowersox, payable to the order *of
either*, precisely as the certificate itself was worded.   This was
consistent with the theory of continued agency, and inconsis-
tent with any claim of ownership by her at that time.   When
the amount, thus collected by the Frederick Town bank, was
put on interest some weeks later, and the certificate in ques-
tion was issued and delivered to her, then, for the first time, ap-
pears the language upon which alone her title can be sustained ;
and it is most significant that nowhere in her testimony does
she found her claim upon the form of the certificate, but merely
upon its delivery to her at that time, and her possession and
control of it, as she testifies, from that date until she delivered

it to the administrator, although if her rights are to be deter-
mined by the face of the certificate as held by the majority of
the Court, they would have been as safe with the certificate
in her husband's possession and control as in her own; and
this brings us to inquire into the circumstances of its delivery
to her, and the character of her possession and control within
the meaning of the rule laid down in *Whalen* v. *Milholland*,
*supra*.

Her husband was then nearly eighty-nine years of age.
Mrs. Rhoads, who lived within a few doors of them for five
months, says he could not walk without his wife's assistance,
and that she had to feed him like a child; that it was with
great difficulty he walked with her assistance two squares to
the barber shop, that he was very feeble and could hardly hold
the pen, on the occasion when he signed his wife's bond as ex-
ecutrix of her sister, and that he could then only make his
mark. Mr. Rhoads testifies that his wife was accustomed to
lead him to the porch and place him in a chair, and that it was
necessary for her to light his cigar and put it in his mouth
when he wished to smoke, and this was nearly a year before
this certificate was issued. The transaction of his business by
her, or by some agent, was therefore a plain necessity, and the
delivery of the certificate to her by Mr. Markell can have no
legal significance. As to her possession of the certificate, she
testified on cross-examination that she had charge of all her
husband's notes and other papers, and up to the date of this
certificate, the preceding certificate and the deposit slip given
for it were clearly his property, for she predicates her claim
upon the last certificate alone. Her possession, therefore, of
the preceding certificate, and of the deposit slip, can only be
consistently referred to the same agency under which she held
her husband's other papers. Consistently with this theory,
and inconsistently with the theory of ownership, *she took this
certificate with her husband's papers to Ohio on his death*, and
when asked on cross-examination why she did so, she replied,
"Well, I didn't know at that time it belonged to me;" and
again when asked if she did not tell Mr. Brewer it belonged to

her husband's estate, she said "not that I remember.    I don't
know that I did;" and again when asked when she first
learned that she had been misled in assigning the certificate
to Mr. Brewer, she replied, "some of my friends in Ohio
*afterwards* told me it belonged to me."    These are not the
acts and declarations of one who knows a gift has been made
to her, and who is standing confidently upon conscious owner-
ship and acceptance.    It appears from the testimony of Mr.
Fout, a clerk in the Frederick Town bank, that she knew how
a deposit should be made in order to indicate absolute owner-
ship, since in December, 1897, on coming into her estate from
Mrs. Bentz, she deposited in the interest account of the same
bank, $500 in her own name.    If, on July 15th, 1898, she was
the absolute owner of the money represented by the deposit
slip, in virtue of an accepted gift from her husband, it is re-
markable that she did not deposit it as she had deposited the
$500, in her own name absolutely.    Although the legal effect
of the form of the certificate, if the effect is to be determined
from its face alone, is such as I have already said would vest
full title in her on his death, yet the use of his name at all,
in view of her present claim, and especially in the same phra-
seology in that part of the certificate which shows *from whom*
the money was received, as was used in the preceding certifi-
cate, is satisfactory evidence to my mind that she continued to
recognize his title to the money.

Coming finally to that part of the certificate which upon its
face creates an estate by the entireties, and from which alone
her title is deduced by the Court, we can find no evidence
whatever that her husband directed or authorized this change,
or that she herself either directed or requested the use of this
form, or that she knew until long after, that it had been used.
The Court holds that her apparent title created by the form
of the certificate must be sustained as a real and rightful title,
unless it should be shown by the appellant that the certificate
was so worded either by deliberate wrong, or by inadvertent
error.    It excludes the hypothesis of inadvertent error for
want of any evidence to sustain it, and it excludes the theory

of deliberate wrongfulness because where fraud is imputed, every presumption obtains in favor of innocence and good faith, and can only be overcome by full and clear proof. With the latter finding I can readily agree, but I am not able to agree with the former. I think there is sufficient evidence to sustain the theory of inadvertent error.

1st. Because I think that up to the moment of issuing the present certificate, her possession was that of agent for her husband, and no act done by the agent without the principal's knowledge and concurrence, of which there is here no evidence, could divest his title.

2nd. Because there is no evidence that she directed, or intended to have made, the change in the form of deposit from which alone a change of title could result. If she had so directed or intended, her conduct would have been tortious, and no presumption can be indulged for this purpose.

3rd. Because I think the use of the form was the act of the bank alone. What was said upon this point in *Whalen* v. *Milholland*, 89 Md. 203, is thoroughly apposite to this case, and I think conclusive. "The words, 'joint-owners' were placed on the book, not because Miss O'Neill requested the bank officers to do so, and not because she thought they would, or designed they should, vest an indefensible title in her sister, but merely because the bank had adopted that form. The words were put there, not as expressing Miss O'Neill's intention, or as limiting her control over the fund, but manifestly to carry out some policy or purpose of the savings bank. They represent and stand for no voluntary and deliberate act of hers at all. In the face of these facts, whatever the import of the words might be had they been consciously and purposely used by Miss O'Neill, they certainly can be given no weight or potency."

In the present case, Mr. Markell, the secretary of the Frederick Town Savings Institution, who received the deposit and issued the certificate, was not asked and did not attempt upon his examination in chief to explain why the change in form was made, but admitted, on cross-examination, that "the in-

stitution entered this deposit received in one form, only to be paid in another form," and that he did not explain this to Mrs. Bowersox at the time, and further, that in his experience as a banker he could give no example of a similar deposit. Nor did Mrs. Bowersox in her testimony state, or suggest any reason for the change of form, nor intimate that she knew the form had been changed, until told by some of her Ohio friends that the money belonged to her. Under these circumstances we can only conclude that Mr. Markell, with the perception which sometimes becomes instinctive with shrewd and prudent bank officers, for some reasons of his own, determined so to frame this certificate as to require the assent of both parties to its payment, and thus to protect the institution against any conflict of interest.

If the words " will be paid to them, or their order " be substituted for the words " joint-owners ; " the name " Jacob Bowersox " for that of " Miss O'Neill ; " and the word " wife " for the word " sister " the passage reproduced above from *Whalen* v. *Milholland*, in view of the almost exact similarity of the circumstances attending the phrasology and issuing of the two certificates, fits this case as the glove fits the hand.

The additional authority referred to in the opinion of the Court (*In re Parry*, 188 Pa. St. 33), while fairly maintaining the legal propositions flowing from the face of the certificate alone, in nowise reflects any light upon the inquiry whether the apparent relation of tenancy by the entireties did in reality exist in the present case; since in the Pennsylvania case the proof was undisputed that the husband himself, with set purpose to create that relation, directed the letter of credit to be so worded. In the opinion of the majority of the Court in the present case the mere relation of husband and wife is made a controlling reason for determining that the apparent relation of tenancy by the entireties did in fact exist, but I am not able to regard this as a satisfactory basis for such conclusion. In *Getchell* v. *Biddeford Sav. Bank*, 94 Me. 452 (47 Atl. Rep. 895), it was urged that as between husband and wife, it should be presumed a gift was intended, when it would not be so pre-

sumed but for such relation, but the Court said "that relation is a circumstance, but not a controlling one," and refused to make such presumption.

I cannot perceive in the present case any sound reason for indulging such presumption, and for the reasons stated I think the decree of the Circuit Court should be reversed and the bill be dismissed.    JUDGE JONES authorizes me to say that he concurs in this opinion.

(Filed February 21st, 1901.)